IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:12CR384 |
| vs. | |
| MICHAEL L. ABRAHAM, | SENTENCING MEMORANDUM |
| Defendant. | |

# BACKGROUND

The matter before the Court is the sentencing of defendant Michael Abraham. A two-count indictment charged Abraham with receipt and distribution of child pornography, and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252(a)(4)(B). Filing 1. Pursuant to a plea agreement, Abraham pleaded guilty to count one (receipt and distribution). Filings 21, 22, and 23. The Court accepted the parties' plea agreement at the sentencing hearing. Filing 32.

The advisory Guidelines sentencing range for Abraham is not in dispute. However, Abraham filed a motion for variance, requesting the Court to vary downward on the basis of the factors set forth in 18 U.S.C. § 3553(a). Filing 26. Additionally, as the parties have previously been advised (filing 32), the Court has considered whether to vary based on its own policy disagreement with the relevant sentencing guideline, U.S.S.G. § 2G2.2.

Receipt, possession, and distribution of child pornography are obviously very serious crimes, and an offender convicted of these offenses deserves a significant prison sentence. But some offenders are worse than others. For instance, some offenders do more to propagate child pornography than others. Some images are more depraved than others. Some offenders are more of a present danger to the community than others. And the sentences imposed for these offenses should represent that. The problem is not that the Sentencing Guidelines are invariably too harsh. They aren't. In fact, in some instances, the Guidelines might be too lenient. The problem is that the Guideline for nonproduction cases does not help the Court distinguish between run-of-the-mill offenders and the worst of the worst. And the Court has a duty to make such distinctions at every sentencing.

The Court has considered the parties' briefs, the revised presentence investigation report ("RPSR") prepared by the United States Probation Office, and the arguments adduced at the sentencing hearing held on May 13, 2013. *See* filings 28, 34, 37, and 39. For the reasons discussed below, the Court finds that Abraham's motion for variance should be granted in part, and the Court will impose a sentence of 6 years' imprisonment, followed by 7 years of tightly structured supervised release. This variance reflects the Court's evaluation of this particular defendant and the Court's finding that § 2G2.2 fails to adequately distinguish between offenders based on their culpability and dangerousness.

## FACTUAL BACKGROUND

From at least 2009 to September 2012, Abraham used various peer-to-peer ("P2P") file-sharing networks to download and share child pornography. RPSR at ¶¶ 15–31. In April 2012, law enforcement officials monitoring these networks observed that a user with an IP address associated with Abraham's computer had child pornography files available for downloading. RPSR at ¶ 15. These included videos showing prepubescent minors, ages 9-11, being sexually assaulted by adult men. At least one video involved bestiality with a dog. RPSR at ¶ 15.

In September 2012, law enforcement executed a search warrant at Abraham's residence. RPSR at ¶ 16. Abraham cooperated with authorities and provided a written statement, admitting to having downloaded and shared child pornography. RPSR at ¶ 19–23. The search recovered various computers and electronic media, which were found to contain 105 videos of child pornography and over 50,000 images of child pornography and "child erotica."[1] RPSR at ¶¶ 17, 25–31. A substantial portion of these images and videos depicted prepubescent females in various states of undress or who were being subjected to digital, oral, vaginal, and anal penetration by adult men. RPSR at ¶¶ 29, 40.

This offense stands in stark contrast to Abraham's personal history. Abraham, who is 47 years old, has three adult children from a previous marriage that lasted from 1991 to 2000. RPSR at ¶ 62. He married again in 2001 and remains married to his second wife. RPSR at ¶ 63. His only prior criminal conviction was from 1989, for reckless driving and attempting to elude a police vehicle, for which he received 10 days' jail and a small fine.

---

[1] This refers to material depicting children or minors as sexual objects or in a sexually suggestive manner, but which is not "sufficiently lascivious" to be defined as "sexually explicit conduct," and hence not "child pornography" as defined by 18 U.S.C. § 2256(2) and (8). *See United States v. Vosburgh*, 602 F.3d 512, 520 n.7 (3d Cir. 2010).

RPSR at ¶ 52. There is no evidence that he has ever had inappropriate contact of any kind with children. Since 1999, Abraham has been steadily employed as a welder. RPSR at ¶¶ 72–73. Abraham served in the Army from 1991 until 1997, when he received an honorable discharge, and in the National Guard from 2001 until his arrest. His service was exemplary, and involved multiple deployments to combat zones during times of war. RPSR at ¶¶ 74–75; Sentencing Recommendation at 2. With 18½ years of service, Abraham was 1½ years from retirement when he was arrested.

In March 2013, Abraham was evaluated by Kirk Newring, Ph.D., a psychologist specializing in forensic behavioral health. During the evaluation, Abraham disclosed that, since a very young age, he has dealt with an addiction to pornography. RPSR at ¶ 65. Over time, he reportedly became habituated to adult pornography and began to seek out more shocking material. RPSR at ¶ 65. Abraham denied any sexual interest in prepubescent children, claiming that he was more interested in images of peripubescent and pubescent children. RPSR at ¶ 66. He further claimed that the P2P program he used did not allow for much filtering of searches, so some of the large batches of files he downloaded included images of prepubescent children. RPSR at ¶ 66. However, forensic examination of his computers showed that he was, in fact, actively seeking pornography focused on prepubescent children, as shown by search terms he used such as "9 y.o." and "11 y.o." Sentencing Recommendation at 2. Moreover, as noted above, a substantial portion of the child pornography found in his possession involved such material. RPSR at ¶ 29. Nonetheless, based on his evaluation and several risk assessments, Newring found that Abraham presented a low risk of committing future acts of sexual misbehavior or violence. RPSR at ¶ 69.

## ANALYSIS

The Court follows the sentencing framework set forth in *Gall v. United States*, 552 U.S. 38, 49–51 (2007). The first step is to calculate the defendant's advisory Guidelines sentencing range, which provides "the starting point and the initial benchmark" for any sentence. *Gall*, 552 U.S. at 49. Next, the Court determines whether any traditional Guidelines departures are warranted. *United States v. VandeBrake*, 679 F.3d 1030, 1039 n.7 (8th Cir. 2012). Finally, the Court considers whether to vary from the advisory Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50; *VandeBrake*, 679 F.3d at 1039 n.7.

### I. Abraham's Advisory Guidelines Sentencing Range

The Court begins by calculating the advisory Guidelines sentencing range. As noted above, the applicable Guideline in this case is found at

U.S.S.G. § 2G2.2.[2] Because Abraham pleaded guilty to receipt and distribution, as opposed to possession, his base offense level is 22. § 2G2.2(a)(2). His total offense level under the Guidelines includes a 3-level reduction for acceptance of responsibility (§ 3E1.1) and reflects the following enhancements: 2 levels because the material at issue included depictions of prepubescent minors or minors under the age of 12, § 2G2.2(b)(2); 5 levels because the offense involved the distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, § 2G2.2(b)(3)(B); 4 levels because the materials included images and videos portraying sadistic or masochistic conduct or other depictions of violence, § 2G2.2(b)(4); 2 levels for the use of a computer or an interactive computer service, § 2G2.2(b)(6); and 5 levels because the offense involved the possession of 600 or more images, § 2G2.2(b)(7)(D). Thus, Abraham's total Guidelines offense level is 37. And his criminal history category of I results in a Guidelines range of imprisonment between 210 and 240 months (which is the statutory maximum). § 2252A(b)(1). Neither Abraham nor the government have moved for a departure, so the Court next evaluates whether a variance is warranted.

## II. Variance

A sentence within the Guidelines range is not presumed to be reasonable; rather, the Court makes an individualized assessment based on the facts of each case. *Gall*, 552 U.S. at 50. If the Court determines that a variance is appropriate, it must consider the extent of the deviation and ensure that there is a correspondingly compelling justification. *Id.* at 50. Ultimately, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of § 3553(a)(2).

In many cases, the Guidelines sentencing range will roughly approximate a sentence that would achieve the objectives of § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). These ranges are typically the product of the Sentencing Commission's careful study, and are "based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. But not all Guidelines possess this pedigree. And where a Guideline does not reflect the careful study of the Commission, it is likely not "a reliable indicator of the Sentencing Commission's perspective on a fair sentence." *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008). In those circumstances, the Court may vary up or down on a case-by-case basis, after making an individualized determination that the Guidelines would yield an excessive (or unduly lenient) sentence. *Spears v. United States*, 555 U.S. 261, 265 (2009)

---

[2] The Court utilizes the 2012 version of the Sentencing Guidelines.

- 4 -

(per curiam). But the Court may go further, and categorically reject a Guideline based upon policy grounds—in other words, when the Court finds that the Guideline consistently yields sentences greater than necessary to achieve the purposes of § 3553(a). *Id.*; *VandeBrake,* 679 F.3d at 1039–40 (affirming categorical rejection of Guideline for antitrust offenses); *see also*, *United States v. Henderson,* 649 F.3d 955, 960 (9th Cir. 2011); *United States v. Grober,* 624 F.3d 592, 599–600 (3d Cir. 2010); *United States v. Corner,* 598 F.3d 411, 415 (7th Cir. 2010) (en banc); *United States v. Cavera,* 550 F.3d 180, 191 (2d Cir. 2008) (en banc); *United States v. Rodriguez,* 527 F.3d 221, 227 (1st Cir. 2008).

As numerous courts and commentators have explained, the child pornography Guidelines are by and large not the result of the Commission's expertise, nor based on careful study and empirical data. *Henderson,* 649 F.3d at 960–63; *United States v. Dorvee,* 616 F.3d 174, 184–86 (2d Cir. 2010). Instead, § 2G2.2 is the result of 2 decades' worth of Congressional directives—at times actively opposed by the Commission—that have continually ratcheted up penalties and piled on enhancements. *Henderson,* 649 F.3d at 960–63; *Dorvee,* 616 F.3d at 184–86; *see also*, *generally*, Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (2009), available at: http://www.fd.org/docs/Select-Topics---sentencing/child-porn-july-revision.pdf (last accessed May 13, 2013). Of course, Congress' active role in shaping § 2G2.2 is not in and of itself reason to question the Guideline's wisdom or efficacy.[3]

---

[3] As the Sixth Circuit recently observed, saying that "Congress has encroached too much on *the Commission's* authority with respect to sentencing policy. . . . is like saying a Senator has encroached upon the authority of her chief of staff, or a federal judge upon that of his law clerk." *United States v. Bistline,* 665 F.3d 758, 761 (6th Cir. 2012). Within our nation's constitutional and democratic framework of governance, it is clearly Congress' role to make such decisions. And unlike the Commission, Congress is free to base its decisions on "political considerations (which, less pejoratively, are oftentimes democratic considerations) . . . ." *Id.*

However, Guidelines are not statutes: they are advisory, not mandatory. So, the fact that this Guideline reflects extensive Congressional involvement does not insulate it from a *Kimbrough* challenge. *Henderson,* 649 F.3d at 963 n.3. As Judge Pratt for the Southern District of Iowa explained, the child pornography statute provides for a broad range of punishment, "and if Congress does not want courts to try and sentence individual defendants throughout that range based on the facts and circumstances of each case, then Congress should amend the statute, rather than manipulate an advisory guideline and blunt the effectiveness and reliability of the work of the Sentencing Commission." *Shipley,* 560 F. Supp. 2d at 744. And in the absence of such an amendment, § 3553(a) is the more authoritative expression of Congressional policy.

The real problem, as courts across the country have recognized, is that § 2G2.2 simply does not work. *Grober*, 624 F.3d at 607–10; *Henderson*, 649 F.3d at 960–63; *Dorvee*, 616 F.3d at 184–86; *United States v. Diaz*, 720 F. Supp. 2d 1039, 1041–42 (E.D. Wis. 2010) (collecting cases). Rather than carefully differentiating between offenders based on their culpability and dangerousness, § 2G2.2 consists of a hodgepodge of outdated enhancements that apply in nearly every case. *Dorvee*, 616 F.3d at 186. As a result, this Guideline routinely results in sentencing ranges near or exceeding the statutory maximum, even in run-of-the-mill cases involving first-time offenders. *Id.*

This has not escaped the Sentencing Commission's attention. Following several years of research, the Commission has issued a comprehensive report on § 2G2.2. United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* (Dec. 2012), available at: http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/ (last accessed May 13, 2013) (hereinafter, "Comm'n Rep."). The Commission concluded that "the current sentencing scheme results in overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior." Comm'n Rep. at 321. At the same time, it results in unduly lenient ranges for other offenders who are more culpable or dangerous. *Id.*

For instance, the Commission found that, for 2010, the enhancements for possessing materials depicting prepubescent minors (§ 2G2.2(b)(2)), use of a computer (§ 2G2.2(b)(6)), and number of images (§ 2G2.2(b)(7)) applied in over 95% of all § 2G2.2 cases. Comm'n Rep. at 209. Approximately 70% of offenders who received a number-of-images enhancement received the maximum 5-level enhancement based on possession of 600 images or more. *Id.* at 141. And the enhancement for possession of material portraying violence or sadomasochistic conduct applied in a slightly lower majority of 74% of all § 2G2.2 cases. *Id.* at 209.

These enhancements were "promulgated in an earlier technological era[,]" when offenders typically received and distributed child pornography through the postal system. *Id.* at 313. Over the last decade, technological changes, such as the widespread use of P2P file-sharing networks, have changed the typical offender's profile. *Id.* at 312–13. In particular, the anonymous and ready accessibility offered by new technologies means that the typical offender's collection has not only grown in volume but is also likely to include more of the worst kinds of material, including graphic sexual abuse of prepubescent children. Now, even "entry-level offenders" can easily

acquire and distribute large quantities of child pornography. *Id.* at 6, 149, 154, 312–13.

Together, these four enhancements add a total of 13 levels, meaning that before any acceptance of responsibility is factored in, the typical receipt or distribution offender—with a base level of 22—has a total offense level of 35. For an offender with no criminal history points, that correlates to a Guidelines range of 168 to 210 months, rapidly approaching the statutory maximum of 240 months, "based solely on sentencing enhancements that are all but inherent to the crime of conviction."[4] *Dorvee,* 616 F.3d at 186; *see also* Comm'n Rep. at 316.

None of this is to suggest that such crimes are not extremely serious. Even the "typical downloader," whose actions never extend beyond the downloading and sharing of files, has contributed to the exploitation and victimization of children. *Bistline,* 665 F.3d at 765 ("That the producers of child pornography are more culpable, however, does not mean that its knowing and deliberate possessors are barely culpable at all."). Each new viewing of this material is part of a continual affront to the privacy, dignity, and mental health of the children depicted. Child pornography victims report "suffering from the knowledge that the images of their graphic abuse are being utilized for sexual gratification." Comm'n Rep. at 113. Because of the widespread distribution of these images, some victims "fear that strangers they see on the street have seen images of their abuse, and they are ashamed and embarrassed that a teacher, a potential date, or a stranger in public will recognize them." *Id.* This is to say nothing of the effect this abuse has on these children's families.

But at the same time, the Court has a responsibility to distinguish between such offenders based on their culpability and dangerousness. And the Court finds that it cannot fulfill this responsibility by deferring to § 2G2.2, which concentrates most offenders at or near the statutory maximum, with little regard for the nature of their offense or their personal characteristics. This is "fundamentally incompatible with § 3553(a)" and "violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct." *Dorvee,* 616 F.3d at 187 (citing *Gall,* 552 U.S. at 55).

Given these inadequacies, some courts have categorically rejected § 2G2.2. *See, e.g., United States v. Beiermann,* 599 F. Supp. 2d 1087 (N.D.

---

[4] This is not even factoring in the enhancement for distribution, which routinely results in a 2- or 5-level enhancement. § 2G2.2(b)(3)(B) and (F). As the Court explains below, while this enhancement applies in fewer cases (42%), it often fails to adequately distinguish between offenders. Comm'n Rep. at 209.

- 7 -

Iowa 2009). Others have stopped one step short and found that the Guideline should be afforded less weight. *See, e.g.*, *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009). Ultimately, this distinction may be more semantic than practical. In *Beiermann*, although the court rejected the Guideline, the court nonetheless retained its basic framework as a starting point, and then proceeded to reject some enhancements while giving others more appropriate weight in the determination of the particular defendant's sentence. 599 F. Supp. 2d at 1107. In doing so, the court fulfilled the responsibility that accompanies the rejection of a Guideline: to formulate a reasoned alternative based upon the court's own penal theory. *Id.*; *see also United States v. Aguilar-Huerta*, 576 F.3d 365, 367 (7th Cir. 2009). This Court also finds that § 2G2.2 remains, at the very least, a useful framework and starting point, and will follow the method set forth in *Beiermann*.[5] The Court will begin by setting forth its findings that will apply in most § 2G2.2 cases, and will then proceed to an individualized assessment of the present case.

### A. The Court's Modified § 2G2.2 Framework

The Court begins with the base offense level set forth in the Guidelines. For receipt or distribution offenders, the base offense level of 22 makes some sense, as it will place them near the mandatory minimum of 5 years if even one or two of the typical enhancements are applied. *Beiermann*, 599 F. Supp. 2d at 1107. By comparison, offenders convicted of only possession, which carries no mandatory minimum, receive a base offense level of 18. § 2G2.2(a)(1). However, as the Commission has explained, there is little if any rational basis for treating *receipt* (as opposed to distribution) offenders differently from possession offenders. Comm'n Rep. at 317–18, 326. First, receipt is generally a logical predicate to possession—unless an offender has produced their own child pornography, they necessarily received it at some earlier point. *United States v. Richardson*, 238 F.3d 837, 839–40 (7th Cir. 2001). This truism is borne out by the Commission's research. After reviewing the presentence reports and plea agreements of all § 2G2.2 offenders for 2010, the Commission found that 95% of offenders convicted of possession had engaged in receipt or distribution. Comm'n Rep. at 147–48.

---

[5] But, to the extent the label matters, this Court declines to categorically reject § 2G2.2, but will instead join those courts affording it less weight. *See, e.g.*, *Cruikshank*, 667 F. Supp. 2d at 702; *United States v. Burns*, 2009 WL 3617448, at *8 (N.D. Ill. 2009). The Court also notes that it is only addressing *nonproduction* cases. Production offenses are covered by separate statutory and Guideline provisions, and different policy considerations. *See, e.g.*, U.S.S.G. § 2G2.1.

- 8 -

Moreover, the original rationales for treating receipt offenses more harshly no longer hold up. Congress's first reason for treating these offenses differently

> related to the manner in which law enforcement officials in the early 1990s detected and prosecuted offenders who trafficked in child pornography. At the time that Congress first criminalized possession in 1990, many offenders who distributed child pornography used the United States postal system to do so. United States postal inspectors often used "reverse sting" operations to detect such offenders and prosecute them for receipt. Prosecutors often filed receipt charges against such offenders rather than distribution charges because, at that time, it generally was easier to prove the offense of receipt than the offense of distribution based on the success of "reverse sting" operations. Today, however, law enforcement officials primarily detect offenders on the Internet and, in particular, can detect and prosecute *distribution*—which typically occurs through the use of P2P file-sharing programs—as or more easily than receipt. . . .
>
> The second apparent reason that Congress cited for punishing receipt more harshly than possession in the early 1990s was that a large percentage of offenders who received child pornography did so by paying for it and, thus, financially contributed to the commercial child pornography industry. That reason also has been undercut by technological changes in offense conduct during the past two decades. Although paying consumers of child pornography still exist today, in recent years the *non-commercial* market for child pornography has "exploded," and the commercial market has assumed a much smaller portion of the overall market. As non-commercial distribution has eclipsed commercial distribution, the typical offender today receives images without providing financial support to the commercial child pornography industry.

Comm'n Rep. at 328–29 (footnotes omitted).

In sum, the Court finds that some corrective measure is necessary to prevent sentencing disparities that are not warranted by offenders' actual conduct or any other rational policy. The Court will therefore impose a base offense level of 20 for the run-of-the-mill § 2G2.2 offender, whether convicted of possession or receipt and distribution. For the rare possession offender who

has not engaged in any distribution, a reduction may be warranted. And for those offenders engaged not only in receipt, but in distribution, the separate distribution enhancement (§ 2G2.2(b)(3)) can be used to more accurately assess culpability.

The Court next finds that the enhancement for use of a computer (§ 2G2.2(b)(6)) should be rejected outright. This enhancement applies in nearly every case and no longer serves any reasonable purpose. Computer use is now so widespread that this enhancement "is a little like penalizing speeding, but then adding an extra penalty if a car is involved." *United States v. Kelly*, 868 F. Supp. 2d 1202, 1209 (D.N.M. 2012) (quotation omitted).

The Court finds that the remaining enhancements at issue in this case (for material depicting prepubescent minors, depicting sadomasochistic conduct, for number of images, and for distribution) are certainly relevant, but should be weighed more carefully and on a case-by-case basis.[6] These are more readily considered below, in connection with Abraham's specific offense conduct.

Before turning to the specifics of Abraham's case, the Court also notes that the Commission has proposed new factors that it believes courts should consider in imposing sentences in § 2G2.2 cases. The Court has carefully considered these and agrees that they will help distinguish between offenders based on their culpability, dangerousness, and risk to reoffend. The Court will consider these factors separately and in interpreting the remaining § 2G2.2 enhancements.

The recommended factors are:

> 1) the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);
>
> 2) the degree of an offender's engagement with other offenders — in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

---

[6] Other enhancements, such as § 2G2.2(b)(5), which applies when the offender has engaged in a pattern of sexual abuse or exploitation of a minor, are not at issue in this case, and the Court declines to consider them at this time. However, the Court notes that unlike some other enhancements, this one truly does distinguish between offenders based upon their dangerousness and culpability. If anything, this factor (which adds 5 levels) may not be weighted heavily enough.

- 10 -

>   3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

Comm'n Rep. at 320.

The first factor is simply a more nuanced approach to matters addressed somewhat clumsily by existing factors—i.e., the enhancements for number of images, and for the presence of material depicting prepubescent minors and sadomasochistic conduct. The third factor is self-explanatory. The second factor, community involvement, bears some additional explanation.

The relevant "community" is generally an internet-based forum or trading network. *Id.* at 93. The Commission reasoned that involvement in such communities may tend to validate offenders' behavior and their warped views regarding children, and that support from like-minded individuals may encourage continued offending. *Id.* at 93-94, 97–98. The Commission also noted that some online communities value and actively encourage members to produce new child pornography, leading to sexual abuse of additional children. *Id.* at 96. While acknowledging that existing social science research is inconclusive as to whether community involvement is associated with an increased risk of committing other sex offenses (and in particular, "contact" sex offenses), *id.* at 94, the Court agrees that this factor merits consideration.

### B. Enhancements Relating to Abraham's Offense Conduct

Under the Court's modified Guidelines approach, Abraham's sentencing range will still be enhanced substantially. However, the ultimate sentencing range will more accurately reflect the severity of his particular offense conduct.

Three of the remaining enhancements relate to the content of Abraham's collection—for material including depictions of prepubescent minors or sadomasochistic conduct or violence, and for the number of images. § 2G2.2(b)(2), (4), (7). As the Court explains, while the volume and content of Abraham's collection warrants a lengthy sentence, the full force of these enhancements should be reserved for even worse offenders.

In applying the enhancements for materials depicting prepubescent minors and violence, the Court will consider factors that will help separate the more significant and sophisticated offender from the run-of-the-mill offender. For example, the Court will take into account the extent to which the offender specifically sought out such material. This will include evidence of the offender's search habits and steps taken to "curate" their collection. It does not make sense to assess the full 6 levels against both an offender

specifically focused on acquiring the worst sorts of material and the offender who has one or two such images among hundreds (or thousands) of images containing less damning material. *See Diaz*, 720 F. Supp. 2d at 1043 ("If harsher punishment is warranted to reduce the demand for material that results in greater harm to children, a defendant who does not specifically seek out the worst should not be treated the same as an offender who does.").

The nature of the material involved in a given case is also relevant. But the Court sees little value in deliberating extensively on whether certain material is "worse" than others. The vilest varieties, of course, include depictions of torture and pain. *See, e.g., United States v. Mantanes*, 632 F.3d 372, 373–374 (7th Cir. 2011). But meaningful distinctions in culpability quickly break down when trying to weigh material that—even when described in the briefest and most clinical terms—is viscerally revolting. On the other end of the spectrum are cases involving depictions of post-pubescent minors, who are not engaged in sexual intercourse. *See, e.g. United States v. Campbell*, 738 F. Supp. 2d 960, 962–63 (D. Neb. 2010) ("This stuff, while cancerous, does not appear to be of the metastatic variety that is the norm.").

Abraham will receive the full 2-level enhancement for possession of material depicting prepubescent minors. The evidence shows that he specifically sought this content and that it made up a substantial portion of his collection. The Court will assess 3 (out of 4) levels for possession of material depicting sadomasochistic conduct or violence. At least some of Abraham's collection consisted of such material. However, the government has not presented evidence that Abraham specifically sought such material, nor that it made up the majority (or even a substantial portion) of his collection.

The Court turns next to the number-of-images enhancement. Under the current Guideline, this enhancement adds anywhere from 2 to 5 levels, depending on the number of images possessed, with the maximum 5-level enhancement triggered by possession of 600 or more images. § 2G2.2(b)(7). In applying this enhancement, the Court will look at more than just quantity. In line with the Commission's recommendation to take a more nuanced approach, the Court will consider a number of factors, such as the duration and intensity of the offender's collecting behaviors. The Court will look to investments an offender has made into his or her collection, such as purchasing multiple hard drives or specialized software. The manner in which the material was obtained is also relevant. For example, an offender who has visited commercial sites and paid for child pornography—while perhaps more likely to be an unsophisticated or novice offender[7]—has

---

[7] *See* Comm'n Rep. at 93 & n.125 (noting that offenders visiting pay websites may have to reveal their identities to pay, thus risking detection, and contrasting these to offenders

contributed financially to the market for this material, and is thus more culpable.

 The Court will also do its best to recalibrate the number-of-images enhancement to the realities of the day. Six hundred images is simply too few to trigger the maximum enhancement when the typical offender has hundreds or thousands of images.[8] Comm'n Rep. at 61. The Court will also, to the extent it is able, make a *realistic* determination of the number of discrete images. For example, an offender should not be held responsible for twice the number of images simply because his computer automatically backs up his data.

 The Court will assess Abraham 4 (out of 5) levels under the number-of-images enhancement. In terms of quantity alone, this case is a no-brainer. Wherever the high end is, Abraham has met it, with 105 videos and over 50,000 images. But the Court is not convinced that, viewed as a whole, Abraham's collecting behaviors call for the full 5-level enhancement. For example, it is not clear how many unique (i.e., non-duplicative) images and videos he possessed. Nor has the government shown what percentage of his collection involved child erotica, as opposed to child pornography.[9] There is no evidence that Abraham took special steps to curate his collection, or used sophisticated technological means to obtain or protect his collection, or avoid detection by law enforcement. In fact, it is apparent that law enforcement rather easily caught Abraham in the act of downloading and sharing files.

 That brings the Court to the final enhancement, for distribution. Among § 2G2.2 offenders, the majority of distribution is a done via P2P networks. Comm'n Rep. at 149–50, 154. That was the case here, and to date, that is the primary method of distribution this Court has observed in most of these cases. In the Eighth Circuit, an offender's use of a P2P network generally qualifies him or her for the 5-level enhancement under § 2G2.2(b)(3)(B), which concerns distribution for the receipt, or expectation of receipt, of a thing of value, other than pecuniary gain. *See, e.g.*, *United States*

---

participating in "private trading groups" whose membership is strictly vetted and which tend to have "more extreme and new material"). It goes without saying that defendants involved in such private trading groups will also be facing steeper penalties.

[8] At this time, the Court is not endeavoring to assign specific numerical ranges to this enhancement. This is the sort of task for which the Commission's empirical expertise would be helpful.

[9] This is not to suggest that the Court will not hold defendants accountable for child erotica. Possession of such material is relevant to determining the nature and extent of an offender's deviant sexual interests. But because such material is not illegal, it should not be treated the same as child pornography.

*v. Dolehide,* 663 F.3d 343, 347 (8th Cir. 2011); *United States v. Durham,* 618 F.3d 921, 929 (8th Cir. 2010).[10] That is the enhancement at issue here, and the Court has no reason to consider the remaining distribution enhancements at this time.

The Court finds that applying the full 5-level enhancement in all P2P cases does not adequately distinguish among offenders, who fall into a broad range of culpability. At one end of the spectrum are offenders for whom sharing via a P2P network is simply incidental to their use of the network, and who may not even fully understand that they are distributing. At the other end are users who are not only consciously sharing, but are taking steps to facilitate the distribution of child pornography. For example, such advanced users might create large bundles of files or curate "series" of related videos for more efficient distribution. Or they might instruct other users on how to find and access material and how to use technology such as anonymous proxies to avoid detection. A higher enhancement should also be reserved for offenders who have created or participated in "closed" P2P networks.[11] Similar considerations apply outside the P2P context, where examples of more aggravated distribution behavior might include moderating a website or forum dedicated to child pornography.

Abraham will be assessed 3 (out of 5) levels for distribution. He was well aware that he was sharing files and did not take any steps to limit his distribution. But the full 5 levels is not warranted in this case. Abraham was using only an open P2P network, and his distribution was essentially incidental to his downloading. There is no evidence that he bartered files or took any steps to become more personally involved in distribution.

When added to a modified base offense level of 20, and crediting Abraham 3 levels for acceptance of responsibility, these enhancements result in a total offense level of 29. As Abraham is in criminal history category I, this results in a (modified) Guidelines sentencing range of 87 to 108 months. This sentencing range more accurately reflects Abraham's individualized culpability than the original Guidelines range of 210 to 240 months, which

---

[10] "We now hold that § 2G2.2(b)(2)(B)'s five-level enhancement . . . applies to a defendant who downloads and shares child pornography files via an internet peer-to-peer file-sharing network, [because] these networks exist—as the name "file-sharing" suggests—for users to share, swap, barter, or trade files between one another." *Dolehide,* 663 F.3d at 348.

[11] In an "open" P2P network, downloading and sharing are generally done with no communication between the parties involved. File-sharing is accomplished in an impersonal, anonymous manner. Comm'n Rep. at 52, 150. By contrast, in a closed P2P network, users may only participate if invited. *Id.* at 53. The Commission has reasoned that use of closed P2P networks suggests greater participation in a child pornography community. *Id.* at 151, 166.

placed him at or near the statutory maximum. The statutory maximum should be reserved for more culpable and dangerous offenders, such as those who have contacted minors or participated extensively in online child pornography communities, and for those who present a much higher risk of reoffending or committing even worse crimes. Conversely, the mandatory minimum of 60 months should be reserved for substantially mitigated offense conduct, which was not present here. The volume and nature of Abraham's collection places him above the most mitigated of cases. But the remaining considerations weigh in favor of a less lengthy sentence. There is no evidence of any "community involvement" by Abraham. Nor does he have any history of sexually abusive, exploitative, or predatory conduct.

Thus, the Court finds that a modified Guideline range of 87 to 108 months' imprisonment is the appropriate calculation under the circumstances. However, the Court finds that an additional downward variance is warranted from the modified Guideline calculation, based upon a full consideration of the remaining § 3553(a) factors.

**C. The Remaining § 3553(a) Factors—Abraham's Motion for Variance**

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101 (quoting § 3553(a)). This includes the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. § 3553(a). In determining an appropriate sentence, district courts must consider a number of factors, including: the nature and circumstances of the offense, the history and characteristics of the defendant, the sentencing range established by the Guidelines, any pertinent policy statement issued by the Sentencing Commission, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50. "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49–50.

The Court has done so in the present case. At sentencing, Abraham argued for the mandatory minimum sentence of 60 months' imprisonment. The government urged the Court to impose a sentence in the range of its original calculations, i.e., a sentence between 210 and 240 months (which is the statutory maximum).

The Court finds that Abraham's motion for a downward variance should be granted in part. In considering *all* of the sentencing factors set forth in § 3553(a), the Court finds that a sentence of 72 months' imprisonment followed by 7 years' structured supervised release, is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

No case is considered in a vacuum. The Court has considered the nature of the offense, as detailed above, and has also considered that the overall sentence should reflect the seriousness of the offense, promote respect for the law, and provide just punishment for this particular offense. § 3553(a)(2). But the Court has also balanced the history and characteristics of this *individual defendant* with the need to provide just punishment and with the need to protect the public from further crimes of this defendant. And, as with all cases, the Court has examined Abraham's overall background, in detail, because the past often serves as a solid predictive gauge of future behavior.

In the present case, 47-year-old Abraham is married, and is fortunate to have solid family support from his wife and three adult children, and his work community, in spite of the current offense. Abraham is currently employed as a welder, and he has been steadily employed as a skilled welder for more than 14 years. In addition, Abraham had honorably served his country in the military for nearly 19 years at the time of sentencing. His military service was exceptional and involved multiple deployments to combat zones during times of war. None of this excuses his current offense behavior, but it provides a more complete picture of the individual who appears before the Court.

The Court also substantially considered the defendant's prior criminal history. Not only does Abraham have no significant criminal history—there is no indication in the record of abuse of his own or other children; no prior history of sexual offenses, let alone ones involving children; and no prior offenses such as voyeurism or loitering that might be seen as precursors to more serious sexual offenses. *Beiermann*, 599 F. Supp. 2d at 1110. The Court finds that Abraham presents little risk of reoffending, and poses even less risk of committing more serious sexual offenses. In reaching this conclusion, the Court has given some, but not substantial, weight to the report of Dr. Kirk Newring. This report was based in part on Abraham's self-reports, in which Abraham minimized his interest in viewing videos of prepubescent

children. Nonetheless, based on his evaluation and several risk assessments, Newring found that Abraham presented a low risk of committing future acts of sexual misbehavior or violence. And a broader examination of Abraham's personal history confirms that he presents a low risk of recidivism, particularly when coupled with a tightly structured supervised release regimen and mental health counseling to treat and monitor his long-term pornography addiction.

Furthermore, immediately upon his arrest and again at allocution, Abraham expressed sincere remorse and candid insight with respect to his addiction, and the damage it has caused. Abraham has now, albeit perhaps belatedly, realized the damage that his offense can do to children and has done to his own family. But it is this type of insight, not often seen at sentencing, that gives credence to Dr. Newring's assessment that Abraham is likely to respond positively to an addiction treatment program designed by mental health professionals.

Given all the § 3553(a) factors, where Abraham stands convicted of a nonproduction child pornography offense, has a low potential for recidivism, has no significant prior criminal history, and where Abraham appears genuinely remorseful about his crime and aware of the harm that it caused, a sentence of 72 months' imprisonment will promote respect for the law and afford an adequate level of deterrence to similar criminal conduct. A sentence of 72 months' imprisonment is a significant sentence to a 47-year-old decorated veteran, who has only been incarcerated one other time, 10 days, for a driving offense. In addition to the 6-year prison sentence, the Court shall impose a 7-year period of supervised release following incarceration, which will include all terms and conditions set forth in the accompanying judgment and commitment order. The structured conditions of supervised release include, among other things, that Abraham shall:

1. Undergo a sex offense-specific evaluation and participate in a sex offender treatment or mental health treatment program approved by the probation office.

2. Participate in a victim awareness program, and shall attend, successfully complete, and pay for any mental health diagnostic evaluations and treatment programs as directed by the probation office.

3. Cooperate with the probation office's computer monitoring program; cooperation shall include identifying computer systems, internet capable devices, or similar electronic

    devices he has access to, and allowing the installation of monitoring software on the devices.

4. Not use or have installed any programs specifically designed to encrypt data, files, folders, or volumes on any media. Also, Abraham shall not install or use any program for the purpose of "wiping," deleting, or cleaning any media device.

5. Not possess, view, or otherwise use material depicting sexually explicit conduct as defined in 18 U.S.C. § 2256.

6. Not associate with or have any contact with convicted sex offenders unless in a therapeutic setting and with permission of the probation office.

7. Comply with Sexual Offender Registration and Notification Act requirements for convicted offenders in any state in which Abraham resides or is employed, as required by federal and state law.

Finally, the Court notes that Abraham has already suffered serious consequences as a result of his crime. Abraham has lost his military retirement, which he was just 1 year from obtaining at the time of sentencing. And Abraham will suffer the stigma of a felony and the shame that accompanies a conviction of this nature in a small community. Again, this in no way excuses his current offense behavior. But the Court finds that the value of any additional prison time as a deterrent would be marginal—the statutory goals of promoting respect for the law and providing just punishment for the offense are satisfied. Abraham is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes. This sentence also satisfies the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct in the District of Nebraska.

## CONCLUSION

Abraham has committed a serious offense, and will be sentenced accordingly. However, the current Guidelines are not a reliable indicator of the Sentencing Commission's view of what a fair sentence should be in nonproduction child pornography cases. This has been made obvious by the Commission's December 2012 report, criticizing § 2G2.2 and recommending

major revisions to the Guidelines. The Court has formulated a reasonable alternative, based on the Commission's recommendations and the decisions of other courts from across the country. For those reasons, and based upon circumstances unique to this case, the Court finds that a sentence of 6 years' imprisonment, following by 7 years' structured supervised release, is sufficient, but not greater than necessary, to comply with the purposes of § 3553(a).

IT IS ORDERED:

1. Abraham's motion for variance (filing 26) is granted in part.

2. A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum, and with the Court's oral pronouncement at the sentencing hearing, will issue this date.

Dated this 15th day of May, 2013.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge